UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA

MATTHEW B. COX

*Plaintiff*

vs.

EFRAIM DIVEROLI

INCARCERATED ENTERTAINMENT LLC

ESTATE OF ROSS REBACK;

WARNER BROS. ENTERTAINMENT INC.;

WARNER BROTHERS PICTURES;

WB STUDIO ENTERPRISES, INC.;

RATPAC-DUNE ENTERTAINMENT LLC;

SIMON & SCHUSTER, INC.;

SIMON & SCHUSTER DIGITAL SALES, INC.;

GUY LAWSON

*Defendants*

Civil Action No.:

**Causes of Action:**

1. Decl. of Authorship
2. Decl. of Ownership
3. Decl. of Accounting
4. Constructive Trust
5. Unjust Enrichment
6. Quantum Meruit
7. Conversion
8. Monies Had & Received
9. Breach of Fid. Duties
10. Fraud
11. Breach of Contract
12. Copyright Infringe.
13. Contrib. Infringement
14. Vicar. Infringement
15. Quantum Meruit

*Jury Trial Demanded*

# CIVIL ACTION

1.      This is a declaratory relief action to declare that Plaintiff Matthew Cox is an author of the copyrighted work *Once a Gun Runner* under the Copyright Act of 1976 and also an owner. This lawsuit also brings associated state law claims against defendants Efraim Diveroli, his company Incarcerated Entertainment, and the Estate of Ross Reback (Plaintiff's former literary agent) for failure to pay *any* proceeds from the book to the book's author, Plaintiff, and numerous breaches of fiduciary duties—as well as an accounting of monies at issue. Plaintiff has not received a single penny from Defendants' exploitation and sale of his work, including from massive legal settlements Defendants entered into which likely eclipse 7 figures.

2.      This lawsuit is also an infringement and declaratory action against Simon & Schuster and Warner Bros., and related Defendants, concerning the creation of the book and movie *War Dogs*. The book and movie were created using Plaintiff's book *Once a Gun Runner*. The lawsuit also brings associated state law claims against those Defendants.

3.      Plaintiff Matthew Cox is a writer of true crime stories and has written five books and 12 article length pieces, one of which appeared in 2015 in Rolling Stone magazine titled "The Dukes of Oxy" (another piece defendant Guy Lawson also improperly took credit for). The subjects he has written about include the world of oxycodone, the mortgage crisis, and gunrunning.

4.      Plaintiff was incarcerated from 2007 to 2019 due to his participation in a mortgage fraud scheme. While in prison, as part of his rehabilitation, he assisted the federal government in identifying predatory and fraudulent mortgage practices from 2007 to 2009, including writing educational course materials.

5.      While assisting the federal government to target and prevent predatory mortgage practices, he discovered that he was good at writing and began a professional true crime writing career using his fellow prisoners as his subject material. Mr. Cox's personal journey has been profiled in The Atlantic (https://www.theatlantic.com/magazine/archive/2019/08/matthew-cox-true-crime/592798/) and Forbes (https://www.forbes.com/sites/walterpavlo/2019/08/06/matthew-cox-emerges-from-prison-as-a-new-man-and-great-author/#533caaff6b17).

6.      In 2012, after Mr. Cox approached defendant Efraim Diveroli about writing a book, Diveroli agreed that Cox should write a story about Diveroli's life. Diveroli was an arms dealer for the US Government before being imprisoned for fraud, drug use, and several DUIs.

7.      Diveroli and Cox were incarcerated together at Coleman Federal Correctional Complex in Florida.

8. In 2011, an article in Rolling Stone was published about Diveroli and his partner David Packouz by an author named Guy Lawson. It attracted attention from the entertainment industry, including from Warner Bros., who wanted to turn it into a movie (that eventually became known as the movie "War Dogs" starring Jonah Hill). The movie was allegedly based upon Lawson's article, and a later book Guy Lawson published also called War Dogs (aka Arms and the Dudes). In fact, at a minimum, Warner used Plaintiff's work to create the movie.

**Cox Writes *Once a Gun Runner***

9. Cox pointed out to Diveroli in or around 2011-2012 that this was Diveroli's story and that he should be putting out his own account, not letting others do it for him.

10. Diveroli waffled, but in late 2012/early 2013 agreed that Cox should write a book about his life.

11. Diveroli asked Cox to help him write the book, claiming that he could never write a book because he suffered from ADHD and could not focus long enough to write a story.

12. During this time period, Cox introduced Diveroli to his literary agent Ross Reback, who was going to help promote the book.

13. The initial discussion was that Cox and Diveroli would co-author the book and split the proceeds 50/50 (the same as in a joint authorship of a joint work). However, Diveroli never ended up writing a single word.

14. In January 2013, Diveroli agreed to pay Cox $500 to write the first draft of the book that became *Once a Gun Runner*. From February to mid-March 2013, Cox worked to write a first draft of the book, with Diveroli providing source material.

15.     When Cox completed the book in or around mid-march 2013, Diveorli gave Cox the $500. As noted, Diveroli never contributed any writing or expression, only source material—even as Cox refined the book over the next few months.

16.     The entirety of the book *Once a Gun Runner* ended up being written by Matthew Cox, and Diveroli did not fix anything in a tangible medium. At a minimum, even if Diveroli could be considered an author, it was a joint work by two co-authors.

**Diveroli Surprises Cox and Demands He Sign a Written Contract**

17.     When Cox finished the first draft of the book in mid-March 2013, he could tell that Diveroli was surprised that Cox had followed through on delivering a high-quality product.

18.     In the early evening of April 8, 2013, at around 6:00 pm or 7:00 pm, Diveroli came to Cox in the prison library with a contract and said that Reback and a lawyer had said that Cox needed to sign the contract immediately. It was titled a "Work For Hire Co Author Agreement." Cox had never seen the document before and it included terms that had never been discussed with him and legal terms which he did not understand.

19.     Diveroli said that the lawyer had said that Cox needed to sign this agreement because otherwise the government would seize all the book's proceeds, delay or halt the book, and make them fight to get it back. The contract's language drastically reduced Cox's take to 10% gross proceeds from the book's exploitation and 5% gross proceeds from any derivative works, and purported to transfer all other rights Cox owned to Diveroli. See Exhibit 3.

20.     Cox was given no chance to review with a lawyer and was essentially ignorant of what was going on. Diveroli was forceful and adamant that the contract needed to be signed at that moment, and said they were going to put all the rights in the book in a corporation and to not worry about the legal formalities because Cox was going to get taken care of (including credit and

monies). Diveroli, and later Reback, said if this was not done the government would take every dime and kill the project. In fact, everything being told to Cox was a lie.

21.     Cox had no legal experience and assumed that what his partner and agent were telling him was the truth. He was excited that one of his books would be sold and that he would be fully credited as an author. He was told by Diveroli not to worry about anything and that he would be taken care of, and Cox trusted his agent Ross Reback who shortly thereafter confirmed what Diveroli had said. It was clear to Cox that Reback and Diveroli had worked together on the contract.

22.     This all occurred in a few minutes on the evening of April 8, 2013.

23.     Unknown to Cox, the contract's real purpose was to allow Diveroli to entirely cut Cox out of the project, and the statements made by Diveroli to induce him to sign the contract were knowingly false.

24.     The contract is entirely invalid. Not only was it induced by fraud, but it is patently devoid of any valid consideration, as described *infra*.

25.     It is furthermore legally nonsensical and written by someone with no copyright law experience. For instance, under the Copyright Act a book cannot be commissioned for hire yet this contract tried to state that the book was for hire. See Copyright Office Circular 30, Works Made For Hire, https://www.copyright.gov/circs/circ30.pdf. Moreover, given that Cox wrote the first draft of the book before this contract even existed, it could not retroactively designate an already existing work as for hire. Lastly, the contract nonsensically labels Cox both a "co-author" and someone working for hire, which are mutually exclusive legal terms.

**Diveroli and Reback Begin to Cut Cox Out of the *Once a Gun Runner* Project**

26. About one month later in May 2013, Diveroli was transferred to another prison. As he was leaving, Diveroli embraced Cox in a bear hug. With visible tears in his eyes Diveroli told Cox that he did not forget his friends and that when Cox got out of prison that Diveroli would be waiting at the gate (at the time Cox's release date was 2030). He said that Cox knew more about him than anyone. For all intents and purposes it appeared to be a heartfelt and sincere display of emotion.

27. Unbeknownst to Cox, he was being played for a fool. Once Diveroli was transferred from FCC Coleman in 2013 to a minimum security prison, and then later released, he ceased all contact with Cox.

28. The only contact Cox had about the project was through Reback and, unknown to Cox, Reback had decided to back Diveroli instead of Cox. Cox was still in prison and thus easily taken advantage of.

29. Cox continued to refine the first draft, and then sent it to Reback over the prison email system, CorrLinks. Note that while Cox's manuscript is based in real life events, Cox fictionalized certain elements of the story to make it more entertaining (delineated *infra*).

30. Despite Diveroli's odd behavior Plaintiff firmly believed that Diveroli and Reback were going to publish the book, and that Plaintiff would be appropriately compensated once the book was published, as this was what made business sense for all involved.

**Diveroli and Reback Delay Publishing the Book, and Materially Harm the Project**

31. Diveroli and Reback, however, inexplicably delayed publishing the book for years after it was finished in 2013-2014.

32. Although Diveroli and Reback were supposed to pitch the book immediately in 2013-2014 to different studios and publishing houses to take advantage of the interest in the subject

material, they inexplicably delayed doing so. This resulted in many lost opportunities, and resulted in Guy Lawson's book Arms and the Dudes being published first in May 2015, later known as War Dogs.

33.     Cox's manuscript was finally published as the book *Once a Gun Runner* in April 2016. The movie "War Dogs" was released in August 2016.

**Diveroli and Reback Incompetently Allow a Competing Author to Obtain the Manuscript**

34.     Unbeknownst to Plaintiff, Diveroli incompetently let Lawson (and by extension Lawson's employer Warner Bros) acquire Plaintiff's manuscript around 2013 and 2014.

35.     A lawsuit Diveroli filed against Simon & Schuster for copyright infringement alleges that Lawson was extremely eager to get more material on Diveroli. See 18-cv-00846 (District of Delaware), Doc. No. 1, at ¶25. While Lawson wrote the initial Rolling Stone article, he did not have enough source material to write a full-fledged book upon which to base the movie.

36.     Diveroli alleges in that lawsuit that he gave the initial manuscript of *Once a Gun Runner* to Lawson—although he did not give permission for Lawson to use it. Id. ¶25-46.[1]

37.     Interestingly, Diveroli falsely claims in this lawsuit that he personally wrote *Once a Gun Runner* from start to finish, omitting any mention of Matthew Cox. In fact, Diveroli did not write a word of the book.

38.     To be clear, Cox never gave permission to Warner or Lawson or Simon & Schuster to use his work.

39.     Sharing the book with Lawson was an inexplicable decision by Diveroli, as there was no legitimate reason to share Plaintiff's work with a competing writer when doing so would

---

[1] Plaintiff notes that Diveroli refers to a "January 2012" manuscript. This appears to be a typo as no manuscript existed before January-March 2013.

obviously negatively impact the success of the book Plaintiff was writing. Defendants' actions hurt the *Once a Gun Runner* project and breached their fiduciary duties to Cox.

40. Many elements and expression from Plaintiff's manuscript appear without permission in Lawson's book. See 18-cv-00846 (District of Delaware), Doc. No. 1, at ¶40. Furthermore, because the War Dogs movie is a derivative work of the War Dogs book, the movie also uses these elements and expression without permission.

41. In sum and substance, Lawson could not have written his book without Plaintiff's manuscript, nor could Warner have released the War Dogs movie.

42. The distribution of the manuscript to third parties attempting to develop similar intellectual property was not authorized by Plaintiff, breached Diveroli's fiduciary duties to Cox, and it materially harmed the exploitation and value of Plaintiff's work.

**When *Once a Gun Runner* is Released Diveroli Deliberately Fails to Credit and Pay Cox**

43. Diveroli is fully aware that he never wrote a word of *Once a Gun Runner*. He is also fully aware that professional author Matthew Cox wrote every word of *Once a Gun Runner*.

44. However, Diveroli is a thoroughly dishonest individual and has at all points attempted to enrich himself at Mr. Cox's expense.

45. Unbeknownst to Plaintiff, on February 14, 2014, Diveroli filed a copyright registration with the Copyright Office stating that Efraim Diveroli was the sole author of the work in question (TXu001911676). See Exhibit 1 - Copyright Registrations. This was not true, and is even put to lie by the alleged contract Diveroli had Cox sign which refers to Cox as a "co-author."

46. On April 5, 2016, Incarcerated Entertainment filed a registration for *Once a Gun Runner* (TXu001985899), also listing Diveroli as the only author. Id. This was also unknown to Cox.

47.     Perhaps realizing that these registrations were laughable, Diveroli and Incarcerated Entertainment then filed a supplemental/corrective registration later in 2016 making clear that (1) the work was not for hire, and (2) that ***Cox was in fact an author***. Id.

48.     However, in a subsequent lawsuit that Diveroli filed in the Southern District of Florida,[2] he and his company began bizarrely alleging that the work actually was for hire (despite books not being able to be created for hire). See 1:18-cv-21991-RNS, at Doc. No. 95, at p.2-3. It is dizzying keeping track of Defendants' flip flops, most of which have no basis in fact.

49.     In any case, after the book was published in 2016 Defendants never provided Cox with any proceeds from the book, an accounting, or any good faith measure to indicate they intended to comply with their legal obligations. Defendants failed to hold his money in trust.

50.     To be clear, Cox's position is that he is the sole author of the book because he wrote the whole thing. If he is a co-author, then he is entitled to an equal individual interest with Diveroli (essentially 50%). However, even if the contract were to be enforced, then Cox would be entitled to 10% ***gross*** revenue from the book.

51.     Yet Diveroli also alleged in the Southern District lawsuit that Cox was not entitled to any money because the book was allegedly not a "commercial success." Of course, because the contract states that Cox is entitled to a portion of gross revenue, whether the book was a success or not is irrelevant to whether Defendants have to pay Mr. Cox. Again, at all points Defendants should have been doing an accounting for Mr. Cox, and keeping his monies in trust.

52.     The simple fact of the matter is that Diveroli used Cox, defrauded him out of his share, and is now trying to avoid even the alleged contractual terms that Diveroli forced on Cox.

**Diveroli and Reback Shop Plaintiff's Book to Hollywood**

---

[2] That lawsuit was improperly filed in federal court despite not having any subject matter jurisdiction.

53.     In addition to giving the manuscript to Lawson, Diveroli, IE, and Reback shopped the book to Hollywood. This also resulted in Warner gaining access to Plaintiff's work.

54.     Producer Elliott Kahn partnered with Simon Spira to pitch *Once a Gun Runner* to Hollywood at the behest of Diveroli and Reback. Spira's father, Steven Spira, was the president of Worldwide Business Affairs for Warner.

55.     Diveroli, IE, and Reback shared the manuscript with Spira and Kahn. Somehow, they did not realize that Spira was the son of Steven Spira, a top Warner executive in charge of Worldwide Business Affairs. This division was directly involved in the production and approval process for the War Dogs movie. It is believed that at this time Spira lived with his father.

56.     In August 2014 Kahn also had discussed Plaintiff's book with the War Dogs' director, Todd Phillips, on a flight.

57.     In short, through Lawson, Spira, and Kahn, Warner acquired Plaintiff's work through multiple avenues.

**Diveroli and His Company Sue and Settle Lawsuits with Warner Bros., Simon & Schuster, and Amazon**

58.     After the movie was released in August 2016, and did well at the box office earning approximately $100 million, Diveroli and his company Incarcerated Entertainment (to which he allegedly transferred his claimed copyright ownership) sued multiple entities including Warner Bros. for unfairly marketing War Dogs (and therefore harming and diverting the sales of *Once a Gun Runner*), infringement, and for otherwise using *Once a Gun Runner* without authorization.

59.     The Warner Bros. lawsuit was docketed at 8:16-cv-01302 in the Middle District of Florida.

60.     In March 2017 Plaintiff attempted to intervene in the lawsuit in the Middle District, against Warner Bros., but after 9 months the lawsuit was settled in November 2017 and his intervention petition was moot, never having been ruled upon.

61.     The settlement monies from the Warner Bros. lawsuit were for the lost book sales of *Once a Gun Runner*. By law, as an author/owner, Plaintiff is entitled to a portion of those settlement monies. Yet, he has received nothing from Defendants who are interfering with his right to possess those settlement monies and other book monies. They have never performed or provided an accounting or held his money in trust for his benefit.

62.     Indeed, Diveroli and IE filed and settled claims against multiple entities for exploiting the copyrighted work *Once a Gun Runner* written by Cox.

63.     This includes suits and settlements involving:

   a.   Amazon for using *Once a Gun Runner* to create an episode of American Greed, docketed at 1:18-cv-00480 in the District of Delaware—settled in November 2018;

   b.   Simon & Schuster and Guy Lawson for using *Once a Gun Runner* to create "Arms and Dudes" (Guy Lawson's book), docketed at number 1:18-cv-06716 and 1:18-cv-00846 in the district of Delaware and Southern District of New York—settled in November 2018; and,

   c.   Warner Bros. for diverting and prevent books sales, docketed at 8:16-cv-01302 in the Middle District of Florida—settled in November 2017.

64.     Upon information and belief, there were other settlements concerning *Once a Gun Runner* entered into by Diveroli, Incarcerated Entertainment, and their assigns and agents, some of which did not involve any formal litigation. This information has been withheld from Plaintiff.

65.     Despite writing hundreds of pages of legal briefs and pleadings, at all points in these lawsuits Diveroli and IE omitted and minimized Plaintiff's authorship of the book *Once a Gun Runner* despite Plaintiff having written the entire book.

66.     For instance, the Complaint against Simon & Schuster states:

a. "In January 2012, Diveroli authorized and wrote his manuscript about his experiences being a gun runner ..."

b. "From November 2013 to June 2014 Diveroli expanded his original January 2012 manuscript into a full draft. By February 2014, that full draft was sufficiently complete ..."

See 1:18-cv-00846, at Doc. No. 1, at ¶¶20, 23.

67. Diveroli wrote nothing and was incapable of doing so.

68. To be clear, in 2013 and 2014 Plaintiff wrote everything and transferred the material to Ross Reback over the prison email system CorrLinks.

69. Given that these lawsuits were expressly to recover for the unauthorized exploitation of *Once a Gun Runner*, and for preventing and diverting books sales of *Once a Gun Runner*, Plaintiff is entitled to a portion of the settlement proceeds—especially because Diveroli is taking credit for Plaintiff's writing to do so.

70. Diveroli, IE, and Reback's actions blatantly violated their fiduciary duties. These breaches included: (1) not promoting and pushing the book in a timely manner, (2) sharing the book with another competing writer, (3) failing to compensate Plaintiff or share the monies, (4) perform and provide an accounting and hold that money in trust for him, and (5) omitting and minimizing his authorship/ownership.

71. Despite inducing Plaintiff to write his book for him, Diveroli never intended to compensate Plaintiff. Plaintiff would never have written the book had he known that Diveroli's representations to induce him to write the book were false.

72. Plaintiff was in an especially vulnerable position because he was in Federal prison and entirely reliant on Diveroli, who had at this point been released.

**Warner Bros uses Plaintiff's Book to Write and Enhance the War Dogs Movie**

73. Publicly, Warner Bros. professes that War Dogs was based on the work of Guy Lawson. Both the script and motion picture are registered with the copyright office as a work for hire.

74. In reality, while Lawson's Rolling Stone article may have been the original seed idea for the movie, Lawson's book was obviously not the sole basis for the movie actually released as War Dogs.

75. Lawson's book was not sufficient to create an entertaining movie. Lawson's book reads more as an extended factual, journalistic piece on Diveroli's gunrunning scheme. During the development of War Dogs it was publicly reported in mid-2014 that the movie was being rewritten.

76. Warner wanted something that would add more entertaining elements. To that end Warner acquired Plaintiff's manuscripts in or around 2014 from Lawson, Spira, and/or Kahn.

77. As a result, numerous elements and pieces of expression from Plaintiff's manuscript appear in the War Dogs movie which are unique to Plaintiff's manuscript.

78. To be clear, these elements and expressions were not present in Lawson's Rolling Stone article or his book, and could only have come from Plaintiff's manuscript and work.

79. Damningly, the elements and expressions taken were the fictionalized parts of *Once a Gun Runner* that Cox created to make the book more entertaining.

80. In contrast to Lawson's book, the movie is presented much more as a memoir of what the main characters went through, and is obviously meant to entertain not educate. Similarly, Cox's book was written as a memoir of Diveroli, with Cox adding fictional elements to make the story more interesting.

81. Much of this fictionalized expression created by Cox, large and small, were included in the movie after Warner Bros. read the *Once a Gun Runner* manuscripts.

82. In some cases, because the movie focuses on Packouz's story, while Cox's book focuses on Diveroli, Warner Bros. took stories about Diveroli and simply recast them around Packouz's character.

83. For instance, in Lawson's book girlfriends of Packouz and Diveroli are barely referenced if mentioned at all.

84. However, in Cox's book, girlfriends were artificially given a much larger role and dominate parts of the story. These plot points, elements, and expression also appear in the War Dogs movie:

    a. In *Once a Gun Runner*, Diveroli spoils his girlfriend by buying her a fancy apartment and throwing his money around to impress her. In the movie, Packouz does the same thing (although Packouz made very little money in real life). This is nowhere in Lawson's work and could only have been drawn from *Once a Gun Runner*.

    b. In Cox's book, Diveroli's girlfriend is against the war and he tries to hide (poorly) the full truth about what he is doing from her. Not coincidentally, the same plot point appears in the movie but using Packouz's girlfriend instead of Diveroli.

    c. In Cox's book, Diveroli's girlfriend is concerned about his gun running, but even if not pleased about it, tolerates it. The same thing happens in the movie with Packouz's girlfriend.

d. In Cox's book it is highlighted that Diveroli's girlfriend has certain sexual interests, including having sex in cars and public places. In the movie, out of the blue and out of character given the on screen behavior of the characters, it is revealed that Packouz and his girlfriend had sex in a car and that this resulted in the conception of their child. This is an oddly specific detail that could only have come from Cox's book.

85.     Other unique aspects of Plaintiff's box also appear in the movie without any parallel in Lawson's material:

a. one of the defining scenes of the movie, which was highlighted in the trailer, is where Packouz and Diveroli allegedly drive from Jordan to Baghdad through the "triangle of death" to drop off guns. This did not happen in real life, and Lawson's book contains nothing remotely similar to it. This was clearly taken from Plaintiff's book, where Cox fictionalized that Diveroli convinced a US Army officer to conduct a similar drive through Baghdad to verify that their guns were delivered so that Diveroli could get paid. That Warner Bros. based the scene on what Cox had fictionalized is beyond peradventure. They had two sources they were working from and many of the most entertaining elements are taken from Plaintiff's book, not Lawson's.

b. In Cox's book he fictionalized that Diveroli has a conversation with his girlfriend on the phone while Army officers think he is debating with a colleague whether to take a certain deal. In War Dogs, Diveroli and Packouz have a conversation about what to have for dinner in front of Albanians who think they are discussing whether to take a certain deal being offered. It is the

same scene, just slightly readjusted. Again, nothing like this appears in Lawson's book upon which the movie was supposedly based.

c. The movie also makes jokes about Packouz "jerking off" his male massage clients. These jokes and references do not appear in Lawson's material. However, references to Packouz being accused of soliciting "happy endings" from his male clients do appear in Plaintiff's book. That this joke appears in War Dogs is again not coincidental.

d. In Cox's book, when Diveroli is arrested, in his mind he identifies and professionally assesses the make and model of the weapons the agents are pointing at him. In War Dogs, Packouz does the same thing when seized by a rival and a gun is pointed in his face.

*****

# PARTIES

**Plaintiff Matthew Cox**

86.    Plaintiff Matthew Cox is a professional writer and author who resides in Tampa, FL, and up until January 2019 was incarcerated at FCC Coleman in Wildwood, FL.

**Diveroli Defendants**

87.    Defendant Efraim Diveroli is Florida resident in the Miami area, in this district,

88.    Defendant Incarcerated Entertainment, LLC is a Florida company, whose address is in the Miami area, in this district. The company is believed to be wholly owned by Diveroli and to function as his alter ego.

89.    Diveroli allegedly transferred his alleged intellectual property rights in *Once a Gun Runner* (to the extent he has any) to Incarcerated Entertainment.

90. Ross Reback was a Florida resident in Palm Harbor, Florida. He was a literary agent for Matthew Cox, and Cox introduced him Diveroli during the process of writing *Once a Gun Runner*. Reback eventually abandoned Cox and began working entirely with Diveroli and Incarcerated Entertainment against Cox's rights and interests. Reback has a management and/or ownership position in Incarcerated Entertainment.

91. Reback died in 2017. Reback had extensive contact with Diveroli and IE in this district related to the subject matter of this lawsuit.

92. When any one of Diveroli, IE, or Reback are alleged to have made an action or omission, Plaintiff is referring to all three defendants given that at all points they closely worked together.

**Warner Defendants**

93. Defendant Warner Bros. Entertainment Inc. is a worldwide entertainment company. It is a Delaware corporation headquartered in Burbank California.

94. Warner Bros. Entertainment owns the War Dogs script copyright (also known as Arms & The Dudes) according to registration PAu003800406, and also co-owns the War Dogs movie copyrights along with defendant Ratpac according to registration PA0001997352.

95. Defendant Warner Bros. Pictures and WB Studio Enterprises, Inc. are subsidiaries of Warner Bros. Entertainment and are listed on the registrations as the authors of the War Dogs script and movie.

96. Defendant Ratpac-Dune Entertainment LLC is a Nevada corporation headquartered in Burbank, CA. It co-owns the War Dogs movie with Warner.

97.     All Warner entities and Ratpac (collectively known as Warner) have conducted substantial business in this district related to the War Dogs movie creation and exploitation, including marketing, advertising, and display of the copyrights.

98.     Note that Warner used Guy Lawson to develop substantial portions of the War Dogs copyrights, and that Lawson assigned and otherwise contracted away all or a portion of his rights in the War Dogs/Arms and the Dudes copyrights to Warner and/or wrote all or portions of the War Dogs copyright as works for hire. These defendants also had extensive contact in the Southern District by and through Lawson and others as it concerns the subject matter jurisdiction in this lawsuit.

99.     Lawson, on behalf of Warner (and Simon & Schuster), had extensive contact with Diveroli and Reback in this District related to the development and exploitation of the book, script, and movie at issue.

100.    Furthermore, as a result of Defendants' conduct Plaintiff has suffered severe damage in this district.

**Simon & Schuster Defendants**

101.     Guy Lawson is a Rhinebeck, NY citizen. He is a writer and author who wrote a Rolling Stone article in 2011 about Efraim Diveroli, and later a 2015 book registered at TX0008113259. Lawson worked closely with Warner to develop the War Dogs copyrights. Lawson had extensive contact with Diveroli, IE, and Reback regarding the War Dogs copyrights, including in this district, while writing his book.

102.    Simon & Schuster, Inc. and Simon & Schuster Digital Sales, Inc. published and sold Lawson's book Arms & the Dudes (also known as War Dogs). Lawson assigned some or all of this rights in the book to Simon & Schuster Inc.

103.    Simon & Schuster Inc. is a New York company with a place of business at 1230 Avenue of the Americas, New York, New York.

104.    Simon & Schuster Digital Sales Inc. is a Delaware Company with a place of business at 51 W. 52nd St, New York, New York.

105.    The Simon & Schuster entities have extensively promoted, marketed, advertised, and sold Lawson's work in this District, and furthermore participated in the creation of the works at issue in this district by and through Lawson.

106.    Furthermore, as a result of all Defendants' conduct Plaintiff has suffered severe damage in this district.

# JURISDICTION AND VENUE

107.    This action is brought, and subject matter jurisdiction lies within this Court, pursuant to 28 U.S.C. §§ 1331 and 1338 and 2201. This Court has federal question jurisdiction in this matter in that Plaintiff seeks legal, declaratory and injunctive relief against the defendants named herein, including but not limited to under Sections 501 through 505 of the Copyright Act of 1976, and 17 U.S.C. § 101 et seq. The Court has pendant/supplemental jurisdiction over any claims asserted herein which arise under state law in that such claims flow from a common nucleus of operative fact.

108.    Venue lies within this Court pursuant to 28 U.S.C. Sections 1391(b)(1) – (3), 1391(c), 1391(d), and 1400(a) in that all defendants reside in this venue and/or they or their agents are found in this jurisdiction and/or they or their agents are subject to personal jurisdiction in this District because they have sufficient minimum contacts with this jurisdiction related to the creation of and exploitation of the copyrights at issue in *Once a Gun Runner*, Arms and Dudes, and War Dogs the movie.

# CLAIMS

## COUNT I – Declaration of Joint Authorship and/or Authorship

*Matthew Cox*

*v.*

*Efraim Diveroli, Incarcerated Entertainment LLC*

109.    Plaintiff incorporates all other content of this complaint into this section.

110.    This is a declaratory relief request under the Copyright Act and 28 USC, section 2201.

111.    Matthew Cox is the sole author of *Once a Gun Runner*. He was the only person who fixed any of the book in a tangible medium. Plaintiff wrote the first draft of the book in February-March 2013, and then refined it over the next year.

112.    Initially, Diveroli and Cox spoke about becoming co-authors, however, Diveroli never ended up writing any content.

113.    However, even if Diveroli's contributions are deemed sufficient to make him an author of the work, at all points Efraim Diveroli and Matthew Cox intended to be joint authors and merge their contributions to create a single work, which is known and published as *Once a Gun Runner*.

114.    Plaintiff therefore requests a declaration that he is the sole author of *Once a Gun Runner*, or in the alternative a joint author with Efraim Diveroli.

115.    This declaration is necessary because Diveroli and his company Incarcerated Entertainment have repeatedly flip flopped as to what Plaintiff's authorship rights are, up to present day.

116.    For instance, Diveroli made the claim in one lawsuit:

"From November 2013 to June 2014 Diveroli expanded his original January 2012 manuscript into a full draft. By February 2014, that full draft was sufficiently complete ..."

See Complaint, 1:18-cv-00846, at Doc. No. 1, at ¶¶23. This lawsuit entirely omits any mention of Cox, as do all lawsuits Diveroli filed relating to the creation of *Once a Gun Runner*.

117.    To be clear, Diveroli did not write anything, but instead only provided source material.

118.    In copyright registrations made in February 2014 in April 2016, Diveroli omitted Cox as author of *Once a Gun Runner*, despite both Cox being identified as an author on the book's cover (albeit Diveroli shrunk Cox's name so that it is barely present).

119.    However, then, in a supplemental/corrective registration in May 2016, Diveroli stated that Cox was a co-author, and also affirmative stated that the work was not made for hire.

120.    Yet, in a recent lawsuit in the Southern District, Diveroli and IE are now nonsensically claiming that Cox created the work for hire for Diveroli.

121.    Given that Defendants have taken many, many contradictory positions concerning plaintiff Cox's authorship rights in *Once a Gun Runner*, Plaintiff is asking that this Court declare his rights once and for all.

122.    Note that Plaintiff's authorship is governed by the Copyright Act's authorship rules, and his authorship first vested when Plaintiff fixed the work in a tangible medium. This was in February/March 2013. The work was then refined later by Cox in 2013-2014.

123.     Plaintiff asks that this court declare that he is the sole author of *Once a Gun Runner*, or in the alternative a joint author of *Once a Gun Runner* with Efraim Diveroli.

124.    Note that Cox's authorship rights are distinct from ownership of the copyright.

125.    As Plaintiff is a professional author, that his authorship be finally determined—and not subject to Defendants' arbitrary whims—is incredibly important and invaluable to him. Plaintiff did not write this book for his contributions and authorship to be minimized and ignored.

126.    Plaintiff asks that this court grant him equitable relief based upon the authorship determination, including but not limited sole or equal billing as an author of the work.

*****

## COUNT II – Declaration of Joint Ownership and/or Ownership

*Matthew Cox*

*v.*

*Efraim Diveroli, Incarcerated Entertainment LLC; Estate of Ross Reback*

127.     Plaintiff incorporates all other content of this complaint into this section.

128.     This is a declaratory relief request under the Copyright Act and 28 USC, section 2201.

129.     Plaintiff is the sole author of *Once a Gun Runner*, or in the alternative a joint author. As such, Plaintiff has either sole ownership over the book's copyright, or in the alternative an equal indivisible ownership interest with Diveroli and/or Incarcerated Entertainment.

130.     Diveroli has allegedly transferred some or all of his rights to Incarcerated Entertainment. It is also believed that Ross Reback was transferred some of the ownership or beneficial ownership rights in *Once a Gun Runner*.

131.     Plaintiff's ownership and/or joint ownership in *Once a Gun Runner* are determined by the Copyright Act's default ownership rules. If Cox is determined to be the sole author, then he is the sole owner of the work. If Cox is determined to be a joint author with Diveroli, then he owns an equal indivisible whole of the work (essentially 50%) with Diveroli and/or his assigns (IE and Reback).

132.     Diveroli also has claimed that Cox contractually assigned some rights in the work to himself. Plaintiff believes that any such contractual assignment is invalid because it was procured by fraud and lacks consideration, as delineated infra in this Complaint.

133.     However, even if the contractual assignment is valid, then Cox still has beneficial ownership in the *Once a Gun Runner* copyright and asks for a declaration of those rights.

134.     Plaintiff therefore asks that the Court declare that he is the sole owner of *Once a Gun Runner*, or in the alternative declare that he is a joint owner or beneficial owner.

*****

## COUNT III – Accounting

*Matthew Cox*

*v.*

*Efraim Diveroli, Incarcerated Entertainment LLC; Estate of Ross Reback*

135.    Plaintiff incorporates all other content of this complaint into this section.

136.    As an owner of *Once a Gun Runner*, Plaintiff is entitled to a portion of all sales and proceeds generated by the book *Once a Gun Runner*—depending on whether Plaintiff is declared to be the sole owner, joint owner, or contractual beneficial owner.

137.    Despite the book having generated significant revenue through sales and legal settlements, Defendants have not provided any money or proceeds to Plaintiff.

138.    Defendants have never performed or provided an accounting to Plaintiff of the revenue made by the book, books sold, details of legal settlements, the money he is due, accounts where money is being held, financial statements, or any other good faith measures to show that Defendants are acting in accordance with their fiduciary duties to Plaintiff.

139.    Defendants have fiduciary duties to Plaintiff, including because they are currently in possession of monies rightfully due to Plaintiff.

140.    All monies rightfully due to Plaintiff should be accounted for and disgorged to Plaintiff. Plaintiff has not received a single penny thus far from the exploitation of his copyrights.

\*\*\*\*\*

## COUNT IV – Constructive Trust

*Matthew Cox*

*v.*

*Efraim Diveroli, Incarcerated Entertainment LLC; Estate of Ross Reback*

141.   Plaintiff incorporates all other content of this complaint into this section.

142.   As an owner of *Once a Gun Runner*, Plaintiff is entitled to a portion of all sales and proceeds generated by the book *Once a Gun Runner*.

143.   Despite the book having generated significant revenue through sales and legal settlements, Defendants have not provided any money or proceeds to Plaintiff.

144.   Defendants have never performed or provided an accounting to Plaintiff of the revenue made by the book, books sold, details of legal settlements, the money he is due, accounts where money is being held, financial statements, or any other good faith measures to show that Defendants are acting in accordance with their fiduciary duties to Plaintiff.

145.   Defendants have never held monies in trust for Plaintiff as they are required to do by law.

146.   Defendants have fiduciary duties to Plaintiff, including because they are currently in possession of monies rightfully due to Plaintiff.

147.    All monies rightfully due to Plaintiff should be kept in constructive trust until such time that the money can be appropriately disgorged and distributed.

*****

## COUNT V – Unjust Enrichment

*Matthew Cox*

*v.*

*Efraim Diveroli, Incarcerated Entertainment LLC; Estate of Ross Reback*

148.     Plaintiff incorporates all other content of this complaint into this section.

149.     As an owner of *Once a Gun Runner*, Plaintiff is entitled to a portion of all sales and proceeds generated by the book *Once a Gun Runner*.

150.     Despite the book having generated significant revenue through sales and legal settlements, Defendants have not provided any money or proceeds to Plaintiff.

151.     Defendants have fiduciary duties to Plaintiff by virtue of their partnership, business deals, joint authorship/ownership, and/or because they are currently in possession of monies rightfully due to Plaintiff.

152.     Equity and good conscience require that Defendants provide to Plaintiff all monies they earned from Plaintiff's work and material.

*****

## COUNT VI – Quantum Meruit

*Matthew Cox*

*v.*

*Efraim Diveroli, Incarcerated Entertainment LLC; Estate of Ross Reback*

153.    Plaintiff incorporates all other content of this complaint into this section.

154.    Plaintiff contributed valuable work to the *Once a Gun Runner* book.

155.    Despite the book having generated significant revenue through sales and legal settlements, Defendants have not provided any money or proceeds to Plaintiff.

156.    Defendants accepted services rendered by Plaintiff, which were especially valuable to Defendants because Plaintiff was the only person in the world who was able to write Diveroli's memoir for him while Diveroli was incarcerated.

157.    At all points Plaintiff reasonably expected compensation and credit, as Defendants were well aware.

158.    Despite providing invaluable services to Defendants, and those services being willingly accepted and exploited by Defendants, Plaintiff has not received the reasonable value of services—or any compensation whatsoever.

159.    Plaintiff therefore asks that he be awarded the fair value of his services provided to Defendants, for which he has not been compensated.

*****

## COUNT VII – Conversion

*Matthew Cox*

*v.*

*Efraim Diveroli, Incarcerated Entertainment LLC; Estate of Ross Reback*

160. Plaintiff incorporates all other content of this complaint into this section.

161. As an owner of *Once a Gun Runner*, Plaintiff is entitled to a portion of all sales and proceeds generated by the book *Once a Gun Runner*.

162. Despite the book having generated significant revenue through sales and legal settlements, Defendants have not provided any money or proceeds to Plaintiff and have retained all monies for themselves.

163. Defendants are therefore interfering with and excluding Plaintiff from exercising the right of possession to the monies he is entitled to, without authority.

164. This is to the detriment of Plaintiff's rights.

165. Plaintiff therefore asks that he be awarded all monies rightfully due to him that Defendants are converting.

*****

## COUNT VIII – Moneys Had and Received

*Matthew Cox*

*v.*

*Efraim Diveroli, Incarcerated Entertainment LLC; Estate of Ross Reback*

166.     Plaintiff incorporates all other content of this complaint into this section.

167.     Defendants have received money properly due to Plaintiff from *Once a Gun Runner*, and have benefited from the receipt of that money by being substantially enriched.

168.     Good conscience requires that they not be allowed to retain those monies that they did not earn and do not own.

*****

## COUNT IX – Breach of Fiduciary Duties

*Matthew Cox*

*v.*

*Efraim Diveroli, Incarcerated Entertainment LLC; Estate of Ross Reback*

169. Plaintiff incorporates all other content of this complaint into this section.

170. As a result of the agreement of Cox, Diveroli, and Reback to write and promote the *Once a Gun Runner* book and develop it, Diveroli (and his successor in interest IE) and Reback owed Cox fiduciary duties.

171. Those fiduciary duties owed to Plaintiff include but are not limited to honesty, loyalty, good faith, and fair dealing by virtue of their agent relationship, putative partnership, business deals, putative joint authorship/ownership, and/or because Defendants are currently in possession of monies rightfully due to Plaintiff.

172. Defendants breached these duties by (1) incompetently sharing Plaintiff's intellectual property with a competing author without permission and also sharing Plaintiff's intellectual property with Spira and Kahn, (2) by failing to promote and push the completed book in a timely manner, (3) by excluding Plaintiff from receiving monies from the exploitation of the book, and (4) by minimizing and omitting his authorship of *Once a Gun Runner*.

173. This conduct is manifestly fraudulent, unethical, improper, and negligent and has resulted in egregious financial, personal, and professional harm to Plaintiff.

174. This harm is multiplied because Plaintiff was until January 2019 a penniless prisoner, and is now a penniless ex-convict.

175. Furthermore, as a direct result of Defendants conduct, Plaintiff has not only not received any of the monies and benefits he is due from the exploitation of *Once a Gun Runner*, but his career has also been harmed.

176.    A professional writer thrives on credit. Yet, at all points Defendants have sought to minimize or omit his authorship, and to take Plaintiff's credit for themselves.

177.    For instance, it is entirely false for Diveroli to claim that he wrote any portion of the book.

178.    Diveroli and Reback when publishing the book unilaterally shrunk Cox's author credit without permission (font size), enlarged Diveroli's cover credit despite him not actually authoring the book, used phrasing to minimize Cox's authorship (stating that book was by "Efraim Diveroli with Matthew B. Cox"), and then excluded Cox from receiving a picture or bio on the back cover.

179.    At all points they acted to exclude and damage Plaintiff and his career.

180.    All of this damage is directly and/or proximately a result of Defendants' conduct.

181.    As a direct and/or proximate result of Defendants' actions, Plaintiff has suffered damages including but not limited to loss of book's revenue, loss of career opportunities, harm to professional reputation, and loss of authorship credit.

*****

## COUNT X – Fraud/Negligent Misrepresentation

*Matthew Cox*

*v.*

*Efraim Diveroli, Incarcerated Entertainment LLC; Estate of Ross Reback*

182.    Plaintiff incorporates all other content of this complaint into this section.

183.    "Florida law defines fraudulent inducement as '[a] false representation of a material fact, made with knowledge of its falsity, to a person ignorant thereof, with intention that it shall be acted upon, followed by reliance upon and by action thereon amounting to substantial change of position.'" Johnson Enterprises of Jacksonville, Inc. v. FPL Group, Inc., 162 F. 3d 1290, 1315 (11th Cir. 1998) (quoting Biscayne Blvd. Properties, Inc. v. Graham, 65 So.2d 858, 859 (Fla.1953)).

184.    Cox agreed to write this book with the clear understanding and expectation that Cox would profit from the benefits and credit for this book. However, as described above, Diveroli never intended to share any of the benefits with Cox and always intended to minimize Cox's credit to the greatest extent possible.

185.    Diveroli later induced Cox to sign this contract by making several fraudulent promises which at the time they were made Diveroli never intended to honor.

186.    **First**, on April 8, 2013, at 6:00 or 7:00 pm in the prison library, Diveroli approached Cox and told him that a lawyer said it was necessary for Cox to sign this contract so that the money the book made was not seized by the US Government because of Cox's restitution agreement.[3] Diveroli said that no matter what Cox would be taken care of and they would use a corporation to

---

[3] Cox owed 25% of his earnings to the US government as restitution, which Diveroli claimed a lawyer said would allow the government to seize all of the copyright's proceeds.

protect the money. Cox was given just minutes to sign the contract and was not given the chance to review with an attorney or anyone else.

187.    Cox has not received a single penny as a result of the exploitation of the book. At all points in time Plaintiffs knew these representations were false, did not intend to compensate Cox, and that they were intended to cause Cox to sign a contract that was manifestly to his detriment.

188.    **Second**, Cox was also told at all points that Cox would be fairly credited as an author inclusive of the copyright and on the book itself. Note that the contract itself constantly refers to him as a "co-author." Not only was he not listed on the copyright, but his author credit on the book was drastically reduced (by font size) without his authorization or knowledge. He was also excluded from having a biography or picture on the back cover.

189.    At all points in time Plaintiffs knew these representations were false, did not intend to fairly credit Cox, and their assurances to the contrary were intended to lure him into a false sense of security and cause Cox to sign a contract that was manifestly to his detriment.

190.    **Third**, the contract provides that Cox would receive 10% *gross* royalties, and 5% for derivative works. However, despite thousands of book sales and three massive settlements with corporate giants, Cox has not received a single penny.

191.    At all points in time Defendants knew all these representations were false, did not intend to provide any compensation to Cox, and their assurances to the contrary were intended to lure him into a false sense of security and cause Cox to sign a contract that was manifestly to his detriment and their benefit. Cox was deprived of almost all of his rights in the work.

192.    The fact that no compensation was provided, and that Diveroli has a long track record of defrauding his business partners and the US government, creates a triable dispute of fact for a jury about whether Cox was induced to sign this agreement by fraudulent misrepresentations.

193.    In reliance on these representations, Plaintiff not only wrote the book, but also introduced Diveroli to his literary agent, Ross Reback. Diveroli intended to cause this reliance for his own benefit and to Plaintiff's detriment. At all points, Plaintiff's reliance on Defendants' statements were reasonable.

194.    These representations were false. Diveroli never intended at any point to honor his representations to Plaintiff, and never intended to provide compensation to Plaintiff or full credit. He intended to induce Plaintiff to write a book for him using representations he knew at that point in time were false and which he never intended to follow through on.

195.    This reliance was manifestly to Plaintiff's detriment as he not only put in a huge amount of work on the book for no compensation and limited credit, but also lost his relationship with Reback, his literary agent.

196.    Plaintiff had no idea when writing the book that Diveroli did not intend to honor his representations or that they were false. This only became clear in late 2016.

197.    To the extent these representations were not fraudulent, then they were negligent.

198.    As a direct result of Defendants' fraudulent and/or negligent misrepresentations, Plaintiff suffered damages including spending years writing a voluminous manuscript without compensation or fair credit, loss of his literary agent, legal costs and fees, harm to his professional writing career, and mental pain, suffering, and anguish.

199.    Given that the agreement was procured and induced by material fraudulent statements, the contract should be declared void.

200.     Plaintiff also seeks a declaration that in addition to being invalid due to fraud, the contract is invalid for lack of consideration.

201.     The problem, which is immediately apparent to anyone with a fundamental knowledge of contract law, is that there is no consideration for this agreement. Remember, each side has to get something out of the agreement that they were not already getting before, or were legally obligated to do.

202.     Here, Cox received no benefit from this transaction he was not already due, nor did Diveroli suffer any detriment. The agreement is entirely one-sided. This is a purely illegal contract.

203.     Diveroli representing in the contract that Cox would receive 10% of the gross royalties from the book is nothing more than promise to do just a small part of something that copyright law already mandated as a result of Cox's authorship/ownership: that Cox receive a minimum of 50% of the book's revenue. This was not a benefit to Cox.

204.     Indeed, under the contract Cox received no benefit. Therefore no consideration is present.

205.     The contract attempts to create the untrue impression that Cox received $500 pursuant to this contract. ***This is absolutely false***. Diveroli, in an oral exchange, agreed to pay Cox in late January 2013 as compensation for writing the initial draft. The draft was finished in March 2013 and that is when the $500 was paid. ***The payment had nothing to do with the later written contract.***

206.     Even if the purported consideration in this contract is somehow deemed sufficient, it is entirely illusory. It has been 3 years since the book was released, and yet Cox has not received a single dime, not even 5 or 10% outlined in the contract for gross royalties—despite thousands of book sales and three settlements with Warner, Amazon, and Simon & Schuster.

207. Note that Diveroli at all times promised to appropriately credit Cox, and the agreement even refers to Cox as a co-author. Cox would never have signed an agreement if he thought he would not be properly credited.

208. Yet, Diveroli deliberately excluded him from the copyright registration (it being highly questionable whether Diveroli should be on the registration as an author at all) and also shrunk Cox's authorship credit on the cover while enlarging his own (again, Diveroli did not even write the book). Moreover, Cox was supposed to have a picture and bio on the back cover, which was omitted by Diveroli.

209. Diveroli has not followed through on the contractual promises, and plainly never intended to. He has also done nothing that he is legally required to do with respect to crediting Cox. It is plain that he is taking great pains to make sure that Cox is excluded to the greatest extent possible.

210. Note that this is Diveroli's modus operandi, a material fact that must be construed in defendant Cox's favor. Every business deal or partnership Diveroli has never intended to honor, tried to change it, back out of it, or otherwise get one over on the opposing side.

211. A reading of *Once a Gun Runner*, the *War Dogs* book, and the *War Dogs* movie serves to make this painfully obvious. The Court should not legitimize and legalize Diveroli's attempt to use the court system to support his outrageous behavior.

212. Given that Diveroli received all the upside, no detriment, and was merely required to do things he was already obligated by law to do, the alleged contract is invalid for lack of consideration.

213. In sum and substance, the contract is naked theft by a notorious fraudster and it is plainly fraudulent and lacking in consideration.

## COUNT XI – Breach of Contract

*Matthew Cox*

*v.*

*Efraim Diveroli, Incarcerated Entertainment; Estate of Ross Reback*

214. Plaintiff incorporates all other content of this complaint into this section.

215. This claim is alleged in the alternative if the contract is determined to be valid, not induced by fraud, and not lacking in consideration.

216. Under the contract, Plaintiff is to receive certain monies including 10% gross revenue made by the exploitation of the book. The contract also has implied covenants of good faith, honesty, and fair dealing by which Defendants must abide.

217. Defendants have breached the contract egregiously.

218. Plaintiff is owed gross revenue from not only the book's sales, but also from the settlements that Defendants have entered into for lost book sales and copyright infringement.

219. Defendants have never remitted a single cent to Plaintiff, breaching the contract. These are damages owed to Plaintiff.

220. Defendants breached the implied covenants by sharing Plaintiff's intellectual property with a competing author without permission, by failing to promote and push the completed book in a timely manner, by excluding Plaintiff from receiving monies from the exploitation of the book, and by minimizing and omitting his authorship of *Once a Gun Runner*.

221. This conduct is manifestly fraudulent, unethical, and improper and has resulted in egregious financial and personal harm to Plaintiff. As Plaintiff was until January 2019 a penniless prisoner—and is now a penniless ex-convict—Defendants' conduct has immeasurably harmed him in ways a normal citizen would better be able to cope with.

222.    As a direct result of Defendants' conduct, Plaintiff has not only not received any of the monies and benefits he is due from the exploitation of *Once a Gun Runner*, but his career has also been harmed.

223.    A professional writer thrives on credit. Yet, at all points Defendants have sought to minimize or omit his authorship, and to take Plaintiff's credit for themselves.

224.    All of this damage is directly and/or proximately a result of Defendants' conduct.

*****

## COUNT XII – Direct Copyright Infringement

*Matthew Cox*

*v.*

*Warner Bros. Entertainment Inc.; Warner Brothers Pictures; WB Studio Enterprises, Inc.;
Ratpac-Dune Entertainment LLC; Simon & Schuster, Inc.; Simon & Schuster Digital Sales, Inc.;
Guy Lawson*

225.    Plaintiff incorporates all other content of this complaint into this section.

226.    Here, both Guy Lawson's book War Dogs (published by Simon & Schuster), and Warner's movie War Dogs, infringe on Plaintiff's copyright *Once a Gun Runner*.

227.    Copyright infringement requires (1) ownership of a copyright, (2) defendant's access to the copyright, and (3) substantial similarity.

228.    Plaintiff is an author and owner of *Once a Gun Runner*, registered at TXu1-373-814 and TXu001911676. *Once a Gun Runner* is an original and novel work written by Plaintiff.

229.    Here, Lawson and Simon & Schuster had access to Plaintiff's work in and around 2013 by and through Efraim Diveroli who provided them the manuscript.

230.    Without authorization, Lawson used substantially similar protected expression from *Once a Gun Runner* in his book War Dogs (formerly Arms and the Dudes). See 18-cv-00846 (District of Delaware), Doc. No. 1, at ¶40. The use of material from *Once a Gun Runner* in the War Dogs book was done without authorization.

231.    The material used by Lawson in the War Dogs book is substantially similar to the work in *Once a Gun Runner*. Lawson and Simon & Schuster thereafter infringed on Plaintiff's copyright by distributing, reproducing, selling, and creating derivative works of Plaintiff's copyrights.

232.    Publicly, Warner Bros. professes that War Dogs was based on the work of Guy Lawson. This makes the movie a derivative of the book. As Lawson took Plaintiff's work, it is axiomatic that the derivative War Dogs movie also infringes on Plaintiff's copyright.

233.    However, while the movie is derivative of Lawson's book, the movie has additional elements that do not appear in Lawson's book.

234.    Warner knew in or around 2014 that Lawson's book in and of itself was not entertaining enough to carry the movie. They therefore engaged in rewrites of the movie using Plaintiff's script. Through Lawson, Spira, and Kahn, Warner acquired Plaintiff's manuscript, to further adapt and write the movie.

235.    Plaintiff's manuscript was desirable because it is highly entertaining, especially the fictionalized parts created by Plaintiff for that reason. Warner took much of that fictionalized expression and used it to create the War Dogs script and/or movie. These fictionalized elements were entirely creations of Cox's mind.

236.    In some cases, because the movie focuses on Packouz's story, while Cox's book focuses on Diveroli, Warner Bros. took Cox's stories about Diveroli and made them from Packouz's point of view.

237.    For instance, in Lawson's book, girlfriends of Packouz and Diveroli are barely referenced if mentioned at all.

238.    However, in Cox's book, girlfriends were artificially given a much larger role and dominate parts of the story. These plot points, elements, and expression also appear in the War Dogs movie. For instance,

      a.  In *Once a Gun Runner*, Diveroli spoils his girlfriend by buying her a fancy apartment and throwing his money around to impress her. In the movie,

Packouz does the same thing (although Packouz made very little money in real life). This is nowhere in Lawson's work and could only have been drawn from *Once a Gun Runner*.

b. In Cox's book, Diveroli's girlfriend is against the war and he tries to hide (poorly) the full truth about what he is doing from her. Not coincidentally, the same plot point appears in the movie but using Packouz's girlfriend instead of Diveroli.

c. In Cox's book, Diveroli's girlfriend is concerned about his gun running, but even if not pleased about it, tolerates it. The same thing happens in the movie with Packouz's girlfriend.

d. In Cox's book it is highlighted that Diveroli's girlfriend has certain sexual interests, including having sex in cars and public places. In the movie, out of the blue and out of character given the on screen behavior of the characters, it is abruptly revealed that Packouz and his girlfriend had sex in a car and that this resulted in the conception of their child. This is an oddly specific detail which could only have come from Cox's book, and which was forced into the movie without consideration to whether it fit the context or characters.

239.    Other unique aspects of Plaintiff's book also appear in the movie without any parallel in Lawson's material. For instance, one of the defining scenes of the movie, which was highlighted in the movie's trailer, is where Packouz and Diveroli allegedly drive from Jordan to Baghdad through the "triangle of death" to drop off guns.

240.    This did not happen in real life, and Lawson's book contains nothing remotely similar to it.

241.   This was taken from Plaintiff's book, where Cox fictionalized that Diveroli convinced a US Army officer to conduct a similar drive through Baghdad to verify that Diveroli's guns were delivered so that Diveroli could get paid.

242.   That Warner Bros. based the scene on what Cox had fictionalized is beyond peradventure. They had two sources they were working from and many of the most entertaining element are taken from Plaintiff's book, not Lawson's (although Lawson's book was itself also based on Plaintiff's work).

243.   Several other parts were also obviously used to write the movie and make it more interesting.

244.   In Cox's book, Diveroli has a conversation with his girlfriend on the phone while Army officers think he is debating with a colleague whether to take a certain arms deal. In War Dogs, Diveroli and Packouz have a private conversation about what to have for dinner in front of Albanian arms dealers who think Diveroli and Packouz are discussing whether to take a certain business deal being offered. It is the same scene, just slightly readjusted. Again, nothing like this appears in Lawson's book upon which the movie was supposedly based.

245.   The movie also makes jokes about Packouz "jerking off" his male massage clients. Packouz was a masseuse. These jokes and references do not appear in Lawson's material. However, references to Packouz being accused of soliciting "happy endings" from his male clients do appear in Plaintiff's book. That this joke appears in War Dogs is again not coincidental.

246.   In Cox's book, when Diveroli is arrested, he professionally assesses and identifies in his mind the make and model of the weapons the agents are pointing at him. In the War Dogs movie, Packouz does the exact same thing when seized by a rival and a gun is pointed in his face.

247.    As much of Mr. Cox's book appears in both the War Dogs book and movie without permission, and the uses are substantially similar, Defendants are liable for copyright infringement.

248.    Defendants have widely distributed, reproduced, displayed, and sold the infringing book and movie War Dogs all over the world.

249.    All predicate acts of infringement occurred in the United States.

250.    Plaintiff therefore requests all resulting damages, including actual damages, statutory damages, attorney fees and costs, and any other relief the Court deems necessary and just.

*****

## COUNT XIII – Contributory Copyright Infringement

*Matthew Cox*

*v.*

*Warner Bros. Entertainment Inc.; Warner Brothers Pictures; WB Studio Enterprises, Inc.; Ratpac-Dune Entertainment LLC; Simon & Schuster, Inc.; Simon & Schuster Digital Sales, Inc.; Guy Lawson*

251.    Plaintiff incorporates all other content of this complaint into this section

252.    To state a claim for contributory copyright infringement a plaintiff must show that the defendants induced, caused, materially contributed to, and participated in the infringement of Plaintiffs' copyrights.

253.    Here, Defendants contributed to and induced infringement of Plaintiff's work by promoting, advertising, selling, and distributing the infringing works for sale.

254.    This materially contributed to the direct infringement.

255.    Plaintiff therefore requests all resulting damages, including actual damages, statutory damages, attorney fees and costs, and any other relief the Court deems necessary and just.

*****

## COUNT XIV – Vicarious Copyright Infringement

*Matthew Cox*

*v.*

*Warner Bros. Entertainment Inc.; Warner Brothers Pictures; WB Studio Enterprises, Inc.; Ratpac-Dune Entertainment LLC; Simon & Schuster, Inc.; Simon & Schuster Digital Sales, Inc.; Guy Lawson*

256.    Plaintiff incorporates all other content of this complaint into this section

257.    To state a claim for vicarious copyright infringement the defendants must vicariously profit from the direct infringement while declining to exercise a right to stop or limit the direct infringement.

258.     Here, all defendants profit from the direct infringement of the infringing copyrights and all of them have a right to stop or limit the direct infringement because they are the owners, publishers, sellers, and distributors of the infringing copyrights.

259.    Plaintiff therefore requests all resulting damages, including actual damages, statutory damages, attorney fees and costs, and any other relief the Court deems necessary and just.

*****

## COUNT XV – Quantum Meruit/Breach of Implied Contract/Unjust Enrichment

*Matthew Cox*

*v.*

*Warner Bros. Entertainment Inc.; Warner Brothers Pictures; WB Studio Enterprises, Inc.; Ratpac-Dune Entertainment LLC; Simon & Schuster, Inc.; Simon & Schuster Digital Sales, Inc.; Guy Lawson*

260.    Plaintiff incorporates all other content of this complaint into this section

261.    This claim is alleged in the alternative to the copyright infringement claims.

262.    This claim is not preempted by the Copyright Act. An action is not preempted if it involves an element over and above the mere reproduction, distribution, or display of the work in question. A right is only equivalent to the rights protected by the Copyright Act, and therefore preempted, if the mere act of reproduction, distribution, or display infringes it.

263.    Here, in this claim, Plaintiff is alleging that he put an extraordinary amount of time and energy into creating the work, and inconvenience, and that he should be compensated for that inconvenience, time, and energy by Defendants who used his work.

264.    At all points, Defendants who used his work knew that he would expect to be compensated.

265.    Plaintiff therefore asks the amount he is owed be determined and that he be awarded an amount of money that appropriately compensates him for his work.

*****

# **<u>RELIEF REQUESTED</u>**

Plaintiff asks for judgment against Defendants, jointly and severally, on all counts and claims, and requests declaratory relief, equitable relief, and/or compensatory damages in an amount in excess of this court's jurisdictional limitations, thereby guaranteeing Plaintiff a jury trial, exclusive of interests and costs, as well as prejudgment interest, post judgment interest, delay damages, costs, and such equitable relief as the Court deems necessary; and requests that this Court determine and declare that Plaintiffs be awarded for all counts:

a.   Declaratory judgment;

b.   Compensatory damages;

c.   Actual damages and/or statutory damages

d.   Contract damages (including but not limited to consequential, expectation, incidental)

e.   Equitable relief;

f.   Punitive damages to punish the Defendants for their extreme and outrageous and malicious conduct, self-interest, and duplicitous behavior;

g.   Exemplary damages to set an example for others;

h.   Attorneys' fees and court costs;

i.   Delay damages; and/or

j.   Any other relief available under the Copyright Act, Such other and further relief and/or equitable relief that this Court deems just and/or necessary.

By: /S/ MICHAEL WALSH
FBN: 0172138
MICHAEL WALSH, P.A.
5301 North Federal Highway, Suite 215
Boca Raton, Florida 33487
(561) 584-4939 Phone
(305) 763-3976
Mwalsh7700@gmail.com

Fdiaz4109@gmail.com
*Attorney for Defendant*


DATE: August 19, 2019

## JURY TRIAL DEMAND

Plaintiff hereby demands a 12-person jury trial.

By: /S/ MICHAEL WALSH
FBN: 0172138
MICHAEL WALSH, P.A.
5301 North Federal Highway, Suite 215
Boca Raton, Florida 33487
(561) 584-4939 Phone
(305) 763-3976
Mwalsh7700@gmail.com
Fdiaz4109@gmail.com
*Attorney for Defendant*

DATE: August 19, 2019

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 19th day of August, 2019, that the foregoing Civil Action Complaint is being served on the following pursuant to the Federal Rules of Civil Procedure:

**Efraim Diveroli**
**Incarcerated Entertainment**
2250 SW 3rd Ave, Suite 205
MIAMI, FL 33129

**Simon & Schuster Digital Sales, Inc.**
51 West 52nd St.
New York, New York 10019

**Simon & Schuster, Inc.**
1230 Avenue of the Americas
New York, New York 10020

**Guy Lawson**
48 Livingston St.
Rhinebeck, New York 12572

**Warner Bros. Entertainment Inc.**
3400 West Riverside Dr.
Burbank, California 91522

**Warner Bros. Pictures**
**WB Studio Enterprises, Inc.**
4000 Warner Blvd,
Burbank, California 91522

**RatPac-Dune Entertainment LLC**
4000 Warner Blvd.
Room 188, Bldg. 95,
Burbank, California, 91522

By: /S/ MICHAEL WALSH
FBN: 0172138
MICHAEL WALSH, P.A.
5301 North Federal Highway, Suite 215
Boca Raton, Florida 33487
(561) 584-4939 Phone
(305) 763-3976
Mwalsh7700@gmail.com

Fdiaz4109@gmail.com
*Attorney for Defendant*


DATE: August 19, 2019